The United States v. Williams. Mr. Strickland. Ms. Strickland. Yes, good morning. May it please the court. Stephon Williams' trial counsel labored under an actual flagrant conflict of interest. Trial counsel in this case simultaneously represented both Mr. Williams and a government witness testifying in order to earn a sentence reduction, and who in fact did receive that reduction while still being represented by the same counsel. The situation at Mr. Williams' trial is one that the old Fifth Circuit and Stephon's said should never happen. This is because counsel owed a duty to this government witness that was directly in conflict with his duty to Mr. Williams. So the inconsistent interests in this case are clear and undeniable. Now, the government's only argument on this issue is that there is no actual conflict because this conflict witness did not mention Stephon Williams in his testimony. But this is a straw man argument, first and foremost, because this is a conspiracy case. And the government itself pointed to this conflict witness' testimony two different times in their closing argument to argue that they had met their burden of proving the drug quantity alleged in the indictment. So the government itself encouraged the jury to use this evidence against Mr. Williams. Further than that, this witness' testimony actually explained some of the other evidence against Mr. Williams, such as his use of the term trafficking in a wiretap. And finally, this witness' testimony actually bolstered and rendered credence to the testimony of other co-conspirators who did provide direct evidence against Mr. Williams. So it's clear that even though Mr. Williams was not mentioned in this testimony, it did impact him. And the government, in fact, encouraged the jury to use this testimony against Mr. Williams. So, therefore, it would be a reasonable thing for counsel to cross-examine this witness because anything that counsel could do to discredit this witness would benefit Mr. Williams. Was it, Ms. Strickland, was there anything either in the sidebar that the defense lawyer asked for or anywhere prior or after in the record about whether or not Mr. Williams knew about the representation? Forget whether he consented to or waived any conflict, but whether he knew about the dual representation? No, Your Honor. There is absolutely nothing in the record indicating that Mr. Williams was made aware of this conflict. And, in fact, he did not know about it until I told him. Counsel, when they put the witness on the stand, they had a very brief sidebar. And the sidebar indicated that the judge, there's an inference that he knew about it ahead of time. Yes, Your Honor. What are the facts about that? When did it come to the judge's attention and then what happened? Your Honor, it's not on the record. I don't have anything showing when this was discussed previously. And could it have happened? I assume it could have happened at a pretrial conference or at something that was not taken down. I couldn't find a pretrial conference with it. Nothing that was taken down has any discussion about this conflict issue that I was able to see. Was Mr. Bennett sentenced by the same district judge? Yes, Your Honor. The same Judge Sands also accepted his plea and sentenced him. With the same lawyer representing him. So that's where the knowledge would have come because Mr. Bennett pled before Mr. Williams' trial, right? Yes, Your Honor. And he was sentenced before, at least the initial sentence was before Mr. Williams' trial because Mr. Bennett was on appeal at the time of Mr. Williams' trial. That's correct, Your Honor. Well, there was another indictment with Reese and all the rest of them. Yes, Your Honor. Bennett wasn't in that indictment, if I recollect. There are two different, there are actually three different indictments. There's a third Minks appeared, I take it, of record in that case. Something said about the second lawyer or whatever. You know when that occurred? When Mr. Minnix was appointed? No, when he was indicted and the history in that case and when Minks entered it. Are you asking about Mr. Williams' case or in Mr. Bennett's case? No, no, Bennett's case. In Mr. Bennett's case, Mr. Minnix entered after the guilty plea but prior to sentencing. Prior to sentencing? Yes, Your Honor. Okay. And before the judge, the same judge? Yes, Your Honor. Judge says? Yes, Your Honor. All right. And when did that take place? Sentencing took place approximately four months before Mr. Williams' trial started. Okay. So at the time of this trial, the judge already knew that Minks was, was he the lead lawyer in the sentencing? Yes, Your Honor. He was the only attorney at sentencing, I believe. So, as I take it, these three indictments were kind of all out of the same crowd? Yes, they're all interrelated and in fact the government both in the opening and closing referred to all of these people as being co-conspirators and all part of the Donaldson organization. All of them did business out of Grandma's house, I take it? Yes, Your Honor. On Cochran Street? I believe so, Your Honor. All right. Ms. Tricklin, you said the first time your client knew of this was when you told him of the potential conflict. Was that post-trial? Yes, Your Honor. It was when I was appointed to this case on appeal. So, I think here it's clear that we have, we have a witness who is represented by the same attorney who is offering evidence that is to be used against Mr. Williams. So, it would be reasonable to attack this witness's credibility and we know that counsel knew of impeachment material because as Your Honors have pointed out, counsel was representing him in this appeal and therefore knew about the letter to Mr. Toombs and also knew that Mr. Bennett had actually received an obstruction of justice enhancement and that is a fact that never came out at this trial. Therefore... I assume that the prosecutor could have gotten Bennett to testify against Williams. Your Honor... Since they were all in one pot. The prosecutor simply stayed away from the problem, the duct of problem, I guess. Yes, Your Honor. They did attempt to craft this agreement where they could avoid an actual conflict. But that is, by trying to avoid the actual conflict, they in fact created it and well, I think the conflict in this case was unavoidable really because the two interests are inherently in conflict with one another and that is one of the things that Freund, this court's en banc decision, instructs us can establish the link between the conflict and the failure to cross-examine this witness is simply the fact that these two interests were inherently in conflict with one another. And I just want to briefly note, Your Honors, I am ready to take questions on the 851 issue if you have any questions but I'm happy to continue talking about the conflict issue as well. Go ahead. Okay. We can also see that cross-examination was certainly not undertaken because of this actual conflict and that's because of that agreement that counsel and the government put on the record at the time that Mr. Bennett was called. Counsel made clear that this was an effort to avoid creating a conflict and it's implicit that they were doing everything they could to avoid having counsel cross-examine his own client because surely they recognize that that would be a conflict. Let me ask you this question. I understand your argument that there was an actual conflict and your client was prejudiced by that in the letter and all those other things, but let's assume we'd find that there was no real prejudice. Does it still require reversal? Yes, Your Honor. And if so, why? Yes, Your Honor, because this is a conflict claim and so the Strickland analysis does not apply. A conflict claim has a different analysis that comes from the Supreme Court  What is your best case for that proposition? Sullivan itself, Your Honor, says that and also I'd note this court's en banc decision in Freund. All you have to do is show an adverse effect on performance once you show actual conflict. Yes, Your Honor. It's the effect on the lawyer's performance and not the effect on the jury. The problem is that everything doesn't come out into the record. So you don't know what Mintz learned from Bennett about this overall operation in representing him at sentencing in his case ahead of time. Exactly, Your Honor. So you don't know how much strategy the lawyer may or may not have engaged in. Yes, that's... He, conceivably, but we don't know, he could have gotten Bennett to take blame away from Williams. Who knows? That's the problem. That's why you don't send them back for an evidential hearing to determine actual conflict. Yes, that's correct, Your Honor. That's why they do that. Yes, Your Honor. I agree with that completely and I see that I'm out of time. So I will step aside and let Ms. Dawson. Ms. Dawson. Your Honor. Good morning. May it please the Court? The government in this case presented evidence of an uncharged conspiracy other than the one that was charged in the indictment. This material variance prejudiced Mr. Toombs since the evidence presented at trial under charge conduct amounted to no more than a buyer-seller relationship. So it is very likely that a jury in this case must have convicted Mr. Toombs of the uncharged conspiracy, especially in light of the fact that there were no cautionary instructions or limited instructions on how to use this evidence that was presented during the trial of the case. Let me ask you this. Your position is there are two separate conspiracies? Yes, Your Honor. The Donaldson conspiracy? Correct. And the Bennett conspiracy? Yes, Your Honor. Didn't Mr. Donaldson testify that he and Mr. Bennett and your client grew up together, they had done business together, and that he and Mr. Bennett were, quote, partners? I believe what Mr. Donaldson, excuse me, Mr. Donaldson And also quote, that they did a lot of business together, close quote. What Mr. Donaldson in essence testified to, Your Honor, was that yes, they grew up together, they lived in the same area, they all knew each other, that he dealt drugs, Mr. Bennett dealt drugs, and at some point in time, that Mr. Bennett would in fact get drugs from him or have him cook drugs, and I believe, Your Honor, that is not necessarily indicative of a conspiracy. Could you change the testimony a little bit? My recollection from the transcript is that he referred to them as partners, and they did business together. I don't believe he did, but I stand corrected if the Court has something different from my recollection of the record, is that Mr. Donaldson testified that Mr. Bennett did in fact obtain drugs from him, and my position is that the fact that there could have been a shared supplier between Mr. Donaldson at some point with Mr. Bennett and Mr. Toombs also buying drugs from Mr. Donaldson does not necessarily equate to conspiracy. But I think more importantly is that the government conceded in its brief that this was a separate conspiracy, more so in its closing argument and opening statement to the jury, the government did reference to the jury specifically on document 312 page 47, which is the government's closing argument, to the jury that they are to present evidence regarding Mr. Bennett's conspiracy and the amount of drugs that was involved in that conspiracy basically is separate from that in reference to the Donaldson's organization. That's not my recollection of how it was presented. I think the argument was this is separate from the 700 whatever drugs. Correct. I think it's a little different than the way you described it. Well, I think in the government acknowledging to the jury that it's separate to me and then the government conceded in its brief specifically that They didn't concede it was a separate conspiracy as I recall, but it was a separate bunch of drugs. Separate amount of drugs. And so if this was one overall conspiracy, I don't think the government would have needed to point it out that there were separate amounts involved. If the jury's sole purpose was to find a conspiracy involving the amount of drugs that was charged in the indictment, which was 500 grams or more. And where does the government concede that there were two different conspiracies in the brief? Do you have a page? I'm sorry. On page 20 of the government's brief and I can Okay. That's all right. Just for reference. Thank you. On page 20 of the government's brief, Your Honor. And my position is, Your Honor, is that given that this evidence of a Bennis conspiracy came into trial, that if you contrast what Bennett testified to Regarding his relationship between him and Mr. Toombs compared to that between Mr. Donaldson and Mr. Toombs, it was very clear at that point in time that one was a conspiracy and one was not. And I'll elaborate for the court. Mr. Reese, which conspiracy did he belong with? Mr. Reese was a part of Mr. Donaldson's conspiracy. They were cousins. Mr. Reese testified at page 64, as I quote, that Toombs was one of the players on the team at that time, close quote. Being a player on the team, a jury could certainly infer that he's part of the conspiracy. However, the only evidence that he presented in reference to qualify that statement was that my client bought drugs from him also. So there's no question that my client bought drugs from Mr. Donaldson at times and from Mr. Reese at times. But other than that, there was nothing else to qualify that he was part of a conspiracy. In its brief, the government points to basically two facts. One, regarding the sales, which I stated does not necessarily suffice to just establish a conspiracy. And the second factor that the government pointed to in its reply brief is that on one occasion, Mr. Toombs warned Mr. Donaldson of police presence in the area. My position is that a singular warning of that nature does not necessarily establish a conspiracy. Rather, this was more self-preservation. Since Mr. Donaldson had an interest in making sure that his supplier was still available to supply him with drugs, it will stand to reason that he would warn someone about police in the area, and especially since they, in fact, knew each other and were friends outside of their dealings since childhood. So that in and of itself… Relying on the Johnson case. I'm sorry? Relying on the Johnson case. I am relying on the Johnson case, Your Honor. And even relying on the Reeves case, which the government cited in its support for a conspiracy. In the Reeves case, this Court did, in fact, find that a conspiracy existed based on multiple transactions or repeated transactions of drug sales. But what was important in the Reeves case… I've got it. Thank you. I'm sorry? I've got it. Thank you. Your time is up. Okay. Ms. Schreiber. May it please the Court? I'd like to begin by addressing Mr. Williams' argument concerning the conflict issue. And I would like to start by… May I ask you a preliminary question? Of course. Ms. Trickman said that the first time Williams was made aware of the potential conflict was post-trial when she described it to Mr. Williams. Do you have any evidence to the contrary? I don't have any evidence to the contrary. And I think that brings up a point that one of the potential problems in dealing with this at the appellate level is that we don't know a lot of the facts. We don't know a lot of the underlying issues that were at play when this happened. One of the Court's questions was when this came up. And as counsel for Mr. Williams pointed out, there's nothing in the record that suggests the first time because what's in the record suggests that the parties had clearly talked about it at some point. But the judge already knew it from sentencing Bennett, that Minx was representing Bennett. And we don't know when the judge was aware that he was representing Williams also. Yes. I mean, I tried to piece it with the record that it's impossible. It is impossible, which again underscores sort of the problem of trying to decide this on direct appeal. And underscores the possibility that this Court might choose to exercise its discretion not to address it on appeal but to send it back to the district court. Without a decision here in this Court. Aside from his consent, what possible issues would a district court have to decide on remand? I mean, you've got dual concurrent representation of two individuals who are charged, although separately, arising out of the same transaction. And one is testifying as a government witness in the other one's trial. And the lawyer chooses not to cross-examine even though he had ammunition on which to cross-examine and hammer credibility. That's all you need. I mean, we have an old case. I don't think it was cited by the parties, but we have an old case. Castillo v. Estelle, 504 F. 2nd 1243. That case involved the dual representation of a victim of a crime in a civil case. And then that person's testifying against a criminal defendant in the criminal case. Both people represented by the defendant. And we find that that's an actual conflict. You don't have to worry about anything else. You don't have to look at anything else. That's what happened here. I mean, how could Mix not have divided loyalties with regards to Mr. Williams and with regard to Mr. Bennett? Well, respectfully, Your Honor, I disagree that we have an actual conflict. Well, how does he not have a divided loyalty? Well, so let me just make a couple of responses to your comments. First, under PEG, in order to establish an ad, I mean, we have to show an actual conflict and an adverse effect. And we can't just presume it, and we can't base it on hypotheticals. And under PEG, existence of a plausible alternative defensive strategy or tactic that might have been pursued, that the alternative strategy or tactic was reasonable under the facts, a link between the actual conflict and the decision to forego the alternative strategy or defense. So, number one, I would tell you, I do not believe we have an actual conflict here. I don't believe they've established it on the record. Because? Because there were, there really is no showing that there were, that he had to forego anything on behalf of Williams because of his representation. Of course. The answer, I mean, to me, and I speak only for myself, I have a completely different view. His client, one of his clients, Bennett, had received an obstruction of justice enhancement. Because, in part because of a letter that he had sent to somebody else. Minx knew about that because he represented Bennett at sentencing. And they were on appeal, and he was trying to get that obstruction enhancement set aside. And if he was successful, they'd go back down. Bennett testifies at trial, and he doesn't cross-examine Bennett at all and impeach him on the fact that he's obstructed justice. And that he's lied and tried to subvert the criminal justice system. He just sits back and does absolutely nothing. And Bennett's testimony purportedly was important to the government because it corroborated other testimony about the existence of the overall conspiracy. And some of the ways that the conspiracy worked. May I remind the court of exactly what Mr. Bennett's testimony was? It was very short. It was directed only to Tombs, and again, Your Honor, going back. And to the existence of the conspiracy. It had to be. If not, his testimony would have been irrelevant. No. Mr. Bennett's testimony. Yes. The conspiracy because it tied Tombs to Donaldson. Very clearly. He says, I've known Mr. Tombs for 20 years. We've sold cocaine base and cocaine powder together. Mr. Donaldson was the cook, and he supplied us with the cocaine that we turned around and sold. Mr. Bennett would get the powder, and he would give it to Mr. Donaldson, who would convert it to crack. Tombs took over Bennett's customers when Bennett was in jail, and then Bennett stopped selling crack, and Tombs sold all the crack. Counsel, I've got another question on the same track. Minks still has an attorney-client relationship with Bennett. Yes. At that time. Yes. He's anxious in Bennett getting a reduction in his sentence if he's adequately representing him. Yes. As a result of Bennett's testimony. To the extent that Bennett could hang Williams and everybody else and Tombs on trial, it would be in Bennett's favor on a motion to reduce sentence. So he's got a fiduciary obligation to Bennett at the time he's in that courtroom with Williams. Now, you suggest maybe sending it back for a hearing. I suggest that the court couldn't ask Minks any questions about his relationship with Bennett because it would invade the attorney-client privilege. He can't ask him any questions about his relationship with Williams for the same reason. He can't sit there and tell the judge, going back in time, here's how I dealt with Bennett and what I learned from Bennett and why there wasn't a conflict, etc. That's my problem. He had an obligation to Bennett at the time he was in the courtroom preparing to cross-examine Williams. He had a duty to bring out from Bennett every piece of evidence that Bennett could provide. Donaldson, as I understand it, grandma's house, Donaldson did the crack cooking. Yes. And so he and Reese, they're all cousins. So that's why they all went to the house. That's why Tunes got the crack from Donaldson because he had to go to grandma's. That's where it all was. He did the cooking there in the shed probably. But at any rate, the point I'm making is he had an abiding obligation to Bennett at the time he's cross-examining that Bennett's testifying. And he had a duty to bring out for Bennett's purposes as much incriminating evidence as Bennett could deliver in that case. So lots of points. Will you agree with that? I think no. Would you agree that he had an obligation to Bennett to have Bennett perform as fully as possible testifying against Williams and Tunes? Not entirely, Your Honor. Mr. Bennett's right to get a Rule 35 reduction didn't depend on the success of the case. All it depended on was for him to testify truthfully. We don't know how many more cases Bennett could have made for the government. We just don't know. All I'm suggesting is he was still his lawyer, and he had an obligation to help him as best he could. And we don't know. I know all about it. I sat on the district court a long time ago, so I know about Rule 35 and reducing sentences. Certainly. And so you know, Your Honor, that if he had . . . Bennett's laboring at what, 80? He's got 188 months? He got 156 months initially, was later reduced to 132. Bennett. Bennett. Yeah. And he was again reduced . . . And reduced after this trial. Correct. That's correct. Based on Rule 35. Let me switch it again. This is why this, at least to me, is so potentially troubling. Who is Bennett going to speak to, aside from the government, about his testimony at Williams' trial? Who do you think? His lawyer. Who is? Mr. Minix. Who's representing Williams at trial? Yes. That's just crazy. So there's a debrief and the government says, okay, we want to talk to your client, see what he's going to be able to testify about. And so there's a debrief with Minix, Bennett, the prosecutor, and they're talking about what Bennett's going to testify at a trial where Minix's other client is a defendant. With all due respect, and again, this is another reason why you might want to send it back. I don't believe that's how it played out. Well, why don't we send it back? How in the world is the judge going to interrogate these Minix and the two, and Bennett? Your Honor, another question. Bennett's going to have to waive his Fifth Amendment right. I mean, that's an impossible situation, which is why cases aren't sent back under these circumstances. Well, I respectfully disagree, and I can cite you to at least two cases in which it did happen. If I can lay my hands on my paperwork quick enough. But, Your Honor, one of the things we don't… Was that a suggestion you made in your brief to send it back? No, Your Honor, it was not. These cases that you're going to tell us about, they cited? No, they're not. But it is this court's regular practice not to consider claims of ineffective assistance to counsel for the first time on direct appeal. And this is under the guise of ineffective assistance… This is not a classic ineffective counsel. It is treated… This is a conflict between two clients. And your comment was, well, Mr. Williams' testimony was short. The suggestion being that, well, it wasn't a big deal. He only testified about Mr. Williams. Mr. Bennett's testimony was short. But that's one of the issues that the defendant raises in this case, that it should have been expanded to cover the letter. But we don't know that. Excuse me. Cover the letter and other things. And I say, we don't know that. And that's why the bar is set so low in these cases to get a conflict situation, because we don't have these kinds of discussions on the federal level. So the parties at the trial level should be very careful not to allow these conflicts to occur. I understand they tried to work it out, but… Do you have… Do you know of any cases where there is dual representation of a criminal defendant and a prosecution witness at the defendant's trial and the holding is there is no actual conflict? Your Honor, I would refer the court in that situation to Stevenson v. Newsom, 774 Fed 2nd, 1558. In Newsom, the court found no conflict that adversely affected representation, even though the same attorney represented the defendant and a witness. The court found there was no reason for the lawyer to cross-examine the witness because the witness's testimony did not implicate the defendant. And I would submit that we have that here. What year was that? 1985, 11th Circuit. Thank you. And I would submit we have that here, Your Honor, because there was no reason for Mr. Minix to cross-examine Mr. Bennett. Mr. Bennett's testimony did not… How do we know that? How in the world do we know there was no reason for him to cross-examine? Suppose he could have buried Williams with his testimony. Well, number one, we could send it back to determine that, but… No, no, because I suggest that the judge cannot interrogate the lawyer about his privileged conversation with his client. So the possibility of an evidentiary hearing in which the judge can interrogate Williams, can interrogate Bennett, and can interrogate Minx about the conversations that they had with Minx is not a possibility. May I suggest that if Mr. Minix had never represented Mr. Bennett, you would never know anything more. And so if you just look at it… We wouldn't have an issue. Of course. We wouldn't have this discussion. Yes, Your Honor. Let's talk. I don't know the Newsom case. Let me ask you about it. Was there a Garcia hearing or not? There wasn't a necessity of that, was it? Your Honor, I do not recall whether there was a Garcia hearing. I don't know the facts, but I would guess, and you tell me if I'm wrong, that the circumstances were different there, that a witness was unconnected with the same drug conspiracy or the same conspiracy. In other words, the defendant and the witness were not in the same illegal pot, so to speak. Is that the Newsom case? Your Honor, I don't recall. Well, that's important. I mean, if it's a witness that he represents in a Medicare fraud case, and a defendant he represents in a drug case, they have no connection. I can see there might be a potential. I wouldn't want to speculate. My recollection is that they were, but not having it in front of me, I don't want to speculate as to that. But the number of things. So first of all, one of the concerns seems to be that the fact that Mr. Bennett got an obstruction of justice enhancement somehow is some reason to think that not everything that Mr. Minix could have done was done, or that everything that could have been challenged on him wasn't challenged. I would like to point out that that obstruction of justice enhancement was, if not specifically identified as an obstruction enhancement, was raised actually by the government on its recross, I believe, or redirect of Mr. Bennett. So some discussion about those letters did come out in the recross. Ms. Howard, can I shift gears for a moment? Yes. Because I only have a few minutes left to go talk about Mr. Toombs' case. Yes. Ms. Toombs' counsel, Ms. Dawson, says that the government conceded in two places, two separate conspiracies in the closing argument and on page 20 of your brief. I recall reading the closing argument. I don't necessarily read it the way Ms. Dawson reads it. Tell me about, I don't have the brief in front of me. To what is she referring? Do you know? I saw you looked at the brief when she said that. Yes, Your Honor. I would say that there's some inartful language in my brief. I believe she might be referring to page 27. 27? I think that might be. Page 20 was the summary of the argument, and I don't believe that's where she meant to go. But I believe it might have been page 27. At the very end of the paragraph, it says, as discussed in more detail above, it's a lot of double negatives. It's a very, very poorly crafted sentence. It says the evidence did not support a finding that Toombs was only involved in a separate conspiracy unrelated to the overall conspiracy. It's kind of poorly drafted. What I wanted to convey in the brief and what I would like to convey to the courts here is that no question that that trial, which involved many people, all of whom were selling drugs in some form or fashion, that there was a lot of evidence about different people dealing drugs on the sides. No question that that is in that case. There was a lot of drug deals being talked about by a lot of different parties. But the fact that there was evidence of side deals or other drug deals going down did not rise to the level of evidence showing multiple conspiracies. The evidence very clearly implicated Toombs in the Donaldson conspiracy. And I might add that this issue was not raised in the district court, so that consideration will be under a plain error standard of review. So the court would have to find that it was plain error not to have charged on multiple conspiracies, and the evidence clearly does not support that. And I might even In your view, the government did not concede to separate conspiracies? No. No, Your Honor. It was not my intention. And I would also add that it's suggested in Mr. Toombs' brief that the district court had an obligation to suspend a charge on multiple conspiracy. And I would like to point out that that would have conflicted with the theories of defense that the parties were offering. Mr. Williams' theory was, I didn't even know anything about drugs, so he certainly wouldn't want a multiple conspiracy charge. And Mr. Toombs' theory was basically, well, that wouldn't mean I wasn't doing drugs either, so he wouldn't want a multiple conspiracy charge. So it would have been rather heavy-handed for the district court to have taken it upon itself to charge on multiple conspiracies. Your Honor, our review of the record does not support, and their brief does not support a finding of an actual conflict with adverse consequences in this case, and we respectfully request that you affirm this case. Thank you. Thank you. Ms. Strickland. Okay. I'd just like to touch on the case that the government has mentioned, which is the only case cited in the government's brief on this issue, Stevenson v. Newsom, which is a 1985 case that's actually in the context of a 2254 petition. And I just want to note all the differences between that case and this one. In Stevenson, counsel was not actively representing that witness at the time he testified. That witness was not testifying for a benefit. That witness did not implicate the defendant, and it was not a conspiracy case. Counsel actually did cross-examine this witness, and I believe the court called the cross-examination thorough and extensive. And the defendant in that case could point to nothing else that counsel could have cross-examined that conflict witness on. So I think Stevenson is a very different case and actually supports our position. And the fact that there's no case exactly on point, at least recently, is because as the old Fifth Circuit said in Stevens, this is just a situation that should never happen. The conflict is so clear. And to the extent that the government argues that we should send this back to the district court to determine if maybe Mr. Williams had waived this conflict, establishing the waiver is the government's burden. So the fact that it's not on the record, they can't go back and do it now. It was their burden. They clearly knew that there was at least a potential conflict here, and no one put any sort of waiver on the record. And finally, I think it's disingenuous for the government to argue that this testimony was not to be used against Mr. Williams when, in fact, they pointed to this testimony two different times in closing, never said this applies to Mr. Toombs only. They asked the jury to use it against Mr. Williams. So with that, I'd just ask this Court I think we have your case. Thank you. Ms. Dawson. Your Honor, I first want to address what the government just referenced regarding their concession. And specifically on page 20 of their brief, in the summary of their argument, in the first paragraph it says, and I quote, there was no material variance of the indictment and no reversal is warranted even though the evidence at trial revealed more than one conspiracy. To the extent that the government is saying, well, this is just something we said in the summary of the argument is an inartful use of the language, I think they're conflating closing argument with a summary. I guess what they're trying to explain to the Court, that what they say in the summary of the argument is not to be considered as a concession because it's not made in the body. But they specifically say this in their closing argument, which basically is a summary of what they argued on page 27. The government's whole premise in their response to Mr. Toombs' allegation is that even though, in essence, we did prove more than one conspiracy, it doesn't matter. He wasn't prejudiced because we believe that the evidence that we presented on the charge conduct was enough to establish a conspiracy. That's the essence of their argument. Was there any argument to that effect at the lower court? As far as Mr. Toombs, Mr. Toombs did not raise an argument regarding buyer-seller. He did, in fact, move for Rule 29, and at that point in time, his basis for the Rule 29 was that they had not proven it a conspiracy, and just because there was some association between the parties, that that was not enough to establish a conspiracy. That was his Rule 29 motion. The argument you're making now and in your brief was not argued below. Is that correct? I'm sorry? The argument you're making now was not made below. No, the argument regarding the material variance and specifically that a buyer-seller relationship was only what was established at trial was not raised below. So we're here on plain error. Yes. And I would also point out to the court. Did you view the outcome would have been different had there been an instruction that was not asked for with regard to two conspiracies? I do believe it would have been because, as I stated, it was clear that counsel below was trying to establish in his Rule 29 motion that the only thing the government had proven at that point in time was that there was some association between the parties and that was not enough to amount to conspiracy. He did not, in fact, argue that it was just merely a buyer-seller relationship, that the association that he was referring to was nothing more than them being buyers, the parties being in a buyer-seller relationship. But one of the things I just want to quickly point out in the government's argument about the fact that they prove a conspiracy is that when you compare the evidence that was presented regarding Mr. Bennett's relationship with my client, it was clear that that was a conspiracy because there was no question over the 11 years that they dealt with each other. My client actually worked for him. Mr. Bennett was responsible for obtaining the drugs. He moved the powder form of the drugs. My client moved the crack form. He sold the drugs out of his house, and he was basically paid as a worker. While in Mr. Donaldson's situation, it was simply buyer-seller, where over a two-year period, he bought drugs from him no more than seven times of $150 at each time. There's a lot of other evidence, though, that he went to Grandma's house and took Mr. Donaldson's place when Mr. Donaldson didn't want to work in the evening. Your Honor, that evidence— Mr. Donaldson referred clients or customers to your client, Mr. Toombs, to sell drugs to him. The lookout situation. The evidence regarding that, Your Honor, was on document 322, page 56, where Mr. Donaldson qualified it and said, on two occasions that my client filled orders for two of his customers, Mr. Rogers and I think Mr. Flamingo. But in any event, it is unclear whether or not that actually occurred at the grandmother's house or whether it occurred at Mr. Toombs' house. He testified that sometimes he didn't like to work at night, and he had Mr. Toombs and others go to Grandma's house and take his place. However, what he did, in fact, say, Your Honor, on document 321, page 167, line 23, he says that, yes, he testified that he had my client assist every now and then. And what he did, in fact, then qualified by saying in the next line, page 168, is that my client made a couple of jugs for him. And when questioned about what that meant, he said that on two times that my client sold drugs on his behalf or filled orders on his behalf to Mr. Zachary Rogers and Mr. Demetrius Flores. And I think what is more important than the fact that he sold it is that on both of those occasions, according to Mr. Donaldson, my client gypped those two individuals. To me, that does not indicate that my client was part of a conspiracy. If he is going to alienate customers of this potential conspiracy, upset Mr. Donaldson, upset these two clients, and just basically do a deal where he benefits, to me that is an indication that he was an independent contractor. Let me refer to another part of the transcript.  Kenneth Reese testified, referring to your client, Mr. Toombs, talked about obtaining drugs, and he goes on to say, it's a lot of times, I probably couldn't get a number, because he, referring to your client, was one of the players on the team at that time. Just a lot of language that a jury could reasonably conclude, beyond a reasonable doubt it seems to me, that he was on the team of these two partners, Mr. Donaldson and Mr. Bennett. And his description of what being on the team meant is that Mr. Donaldson, excuse me, Mr. Toombs bought drugs from him. That was the extent of all that he can offer regarding my client and the relationship that he had with Mr. Donaldson and himself, is that he bought drugs from him. I think we have your argument. Thank you. Ms. Franklin, you were court appointed, and we appreciate your having taken the case. We'll move to Gonzales v. Attorney General.